UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SIMON KINSELLA and DAVID FINK,

                             Plaintiffs,

      -against-

INCORPORATED VILLAGE OF EAST
HAMPTON, EAST HAMPTON VILLAGE POLICE
DEPARTMENT, PAUL F. RICKENBACH, JR.,
*individually and in his official capacity*, JEFFREY
ERICKSON, *individually and in his official
capacity*, MICHAEL J. TRACEY, *individually and
in his official capacity*, GERARD LARSEN, JR.,
*individually and in his official capacity*, EBEN
BALL, *individually and in his official capacity*, and
JOHN AND JANE DOE POLICE OFFICERS 1-4,
*individually and in their official capacities*,

                             Defendants.
-------------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**
15-cv-3948 (GRB)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

      Presently before the Court in this civil rights litigation, on referral from the

Honorable Gary R. Brown for report and recommendation, is Defendants'

Incorporated Village of East Hampton (the "Village"), the Village's Police Department

(the "Department"), Paul F. Rickenbach, Jr. ("Rickenbach"), Jeffrey Erickson

("Erickson"), Michael J. Tracey ("Tracey"), Gerard Larsen, Jr. ("Larsen"), and Eben

Ball ("Ball" and together with Rickenbach, Erickson, Tracey, and Larsen, the

"Individual Defendants," and together with the Village and the Department,

"Defendants") motion for summary judgment ("Defendants' Motion" or "Def. Mot."),

pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), DE

[129].

1

By way of Complaint filed on July 7, 2015, Plaintiffs *pro se* Simon Kinsella ("Kinsella") and David Fink ("Fink" and together with Kinsella, "Plaintiffs") commenced this action against Defendants pursuant to 42 U.S.C. § 1983 for: (i) false arrest, malicious prosecution, malicious abuse of process, excessive force, failure to intervene, and conspiracy in violation of the Fourth Amendment against all Defendants; (ii) denial of their rights to free speech and protest in violation of the First Amendment against all Defendants; (iii) denial of their right to counsel in violation of the Fifth and Sixth Amendments against all Defendants; (iv) denial of equal protection and privileges and immunities under the law in violation of the Equal Protection Clause of the Fourteenth Amendment against all Defendants; (v) denial of medical treatment in violation of the Fourteenth Amendment against all Defendants; and (vi) various constitutional violations against all Defendants pursuant to *Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 658-59, 98 S. Ct. 2018, 2019-20 (1978). *See* Complaint ("Compl."), DE [1], at 17-27.[1]  For the reasons set forth below, the Court respectfully recommends that Defendants' Motion be granted in its entirety and that the Complaint be dismissed with prejudice.

## I.    BACKGROUND

### A. <u>The Parties</u>

The following facts are taken from the parties' pleadings, declarations, exhibits and Local Rule 56.1 statements and, except where indicated, are not in dispute.

---

[1] While Fink and Kinsella are currently proceeding *pro se*, they were represented by two sets of retained counsel from the filing of the Complaint until July 28, 2020, *see* Compl., DEs [47], [50], [104]. The Court permitted counsel to withdraw due to the breakdown of the attorney-client relationship. *See* DEs [47], [104].

During the below events, Plaintiffs were residents of the Village, a municipality located in Suffolk County, New York. *See* Defendants' 56.1 Statement of Undisputed Facts ("Def. 56.1"), DE [129-2], ¶¶ 2-3, 9. The Department is the Village's police department. *Id.* at ¶ 10. Rickenbach served as the Village's mayor from June 1992 through mid-2020. *Id.* at ¶ 4. Erickson and Ball are currently employed by the Department as police officers. *Id.* at ¶¶ 5, 8. Tracey has been employed by the Department as a police officer since 1984, held the rank of captain during the events at issue, and currently serves as the Department's chief of police. *Id.* at ¶ 6. Larsen served as the Department's chief of police during the events at issue, but has since retired. *Id.* at ¶ 7.

## B. <u>Romney's July 8, 2012 Fundraiser</u>

On July 8, 2012, Ronald O. Perelman held a fundraiser at his estate located at 291 Montauk Highway in East Hampton, New York (the "Perelman Estate") for then-presidential candidate Mitt Romney ("Romney"). *Id.* at ¶ 15. The Perelman Estate is bordered on the south side by Georgica Pond (the "Pond"). *Id.* at ¶ 19. On or about July 6, 2012, Tracey was contacted by a representative of the United States Secret Service (the "Secret Service"), who requested the Department's assistance in providing security for Romney during his attendance at the Perelman Estate fundraiser. *Id.* at ¶ 16. Specifically, the Secret Service requested that the Department set up a security perimeter around the Perelman Estate to prevent any unauthorized individuals from gaining access to the event. *Id.* at ¶ 20. Tracey agreed to do so and, prior to the fundraiser, coordinated with representatives from other local

and state law enforcement agencies, to assist the Secret Service in protecting Romney during the fundraiser. *Id.* at ¶¶ 17-18.

On the date of the fundraiser, the Department established a security perimeter in the Pond that stretched approximately 500 feet from the Perelman Estate's southern shoreline. *Id.* at ¶ 21. The Secret Service also set up a designated demonstration area, where protestors would be able to protest. *See* Defendants' Statement of Additional Material Facts Not In Dispute ("Def. Add'l 56.1"), DE [131-1], ¶ 5. Indeed, the portion of the Pond that fell within the Secret Service's security perimeter was closed in order to prevent unauthorized, unscreened individuals from accessing the Perelman Estate for the duration of the event. *See id.* at ¶ 9. According to Defendants, in addition to concerns about people breaching the security perimeter, the Secret Service was concerned that individuals could set up weapons outside of the perimeter and harm Romney from a distance. *Id.* at ¶¶ 11-12. For these reasons, the Secret Service directed local law enforcement personnel assigned to patrol the perimeter to intercept and prevent unauthorized, unscreened boaters – who may have posed a threat to Romney – from breaching the security perimeter. *Id.* at ¶¶ 13-14.

That morning, Erickson was assigned to work with the East Hampton Town Police Marine Patrol (the "Marine Patrol") to establish a perimeter and patrol the Pond. *See* Def. 56.1 ¶ 22; Def. Add'l 56.1 ¶ 10. At approximately 10:30 a.m. on July 8, 2012, Erickson and Dale Petruska ("Petruska"), a senior harbormaster with the Marine Patrol, met at the Department's headquarters. *See* Def. 56.1 ¶¶ 23-24. From there, the pair picked up a motorboat owned by the Marine Patrol, which they

transported to Georgica Pond with Petruska's police vehicle. *Id.* at ¶ 25. Upon arriving, Erickson and Petruska parked Petruska's vehicle at the southwest edge of the Pond, and launched the motorboat into the water. *Id.* at ¶¶ 26-27 While in the water, Petruska navigated the motorboat, while Erickson was only a passenger. *Id.* at ¶ 28. Both Petruska and Erickson wore special police uniforms, with conspicuous police shoulder patches and badges. *Id.* at ¶¶ 29-30. Petruska stationed the motorboat approximately several hundred feet south of the Perelman Estate, and remained there until the interactions leading to Plaintiffs' arrests. *Id.* at ¶¶ 31-32.

C. **Plaintiffs' Pre-Arrest Actions**

At some point thereafter, Erickson and Petruska observed Plaintiffs sailing towards the motorboat in an approximately 14-foot-long sailboat. *Id.* at ¶ 33. When Plaintiffs came within approximately 100 feet of the motorboat, Erickson ordered them to stop the sailboat and turn around. *Id.* at ¶ 34. Plaintiffs did not stop, however, and continued sailing in a northeasterly direction, toward the Perelman Estate. *Id.* at ¶ 35. As Plaintiffs continued northeast, Petruska repositioned the motorboat so as to stop them. *Id.* at ¶ 36. Erickson again instructed Plaintiffs to turn their sailboat around. *Id.* Notwithstanding Erickson's repeated instructions, Plaintiffs responded by stating that they had a right to sail on the Pond pursuant to the Dongan Patent, a December 1686 document, by which King James II of England granted residents of the Town of East Hampton the right to create a governing body known as the "Trustees of the Town of East Hampton," whose purpose was to preserve the rights of East Hampton Town residents to use its natural resources, including

harbors, creeks, quarries, marshes, waters, lakes, and rivers. *Id.* at ¶¶ 37-38. As Plaintiffs' sailboat again drew closer, Erickson observed both Plaintiffs on their cell phones. *Id.* at ¶¶ 39-47, 64.[2]

Plaintiffs' sailboat then collided with the Marine Patrol motorboat. *See* Def. 56.1 ¶ 48. After the collision, Erickson grabbed one of the sailboat's lines, tied it to the motorboat, and informed dispatch that he was having a problem with Plaintiffs and their sailboat. *Id.* at ¶¶ 49-50. Thereafter, Erickson directed Plaintiffs to turn around and proceed away from the Perelman Estate, but Fink again declined, citing the pair's absolute right to sail on the Pond. *Id.* at ¶¶ 51-52. Erickson then ordered Plaintiffs to lower their sail and, according to Defendants, advised Plaintiffs that they would be arrested if they continued to fail to comply. *Id.* at ¶ 53. Plaintiffs again invoked their rights under the Dongan Patent, at which point Erickson informed both men that they were under arrest and instructed them to lower their sail. *Id.* at ¶¶ 54-55. At this point, Fink exited the sailboat into the approximately four-foot-deep water, began wading towards the shoreline, and eventually ended up at the property line of the Perelman Estate. *Id.* at ¶¶ 56-57. Erickson informed Tracey of Fink's movement, and Tracey advised the private security detail at the Perelman Estate of Fink's apparent approach. *Id.* at ¶¶ 58-60. Erickson again directed Kinsella, who had remained in the sailboat, to lower his sail and advised Kinsella that he was under

---

[2] Erickson subsequently learned that Plaintiffs had dialed 911 and explained their situation to emergency dispatchers, who apparently instructed Plaintiffs – despite Plaintiffs' repeated invocations of their rights pursuant to the Dongan Patent – to comply with Erickson's lawful orders. *Id.* at ¶¶ 41-47.

arrest. *Id.* at ¶¶ 61-62. Kinsella again stated that he was entitled to sail anywhere on the Pond. *Id.* at ¶ 63.

### D. **Kinsella's Arrest and Transfer to the Police Station**

As Erickson boarded the sailboat, intending to arrest Kinsella, he observed Kinsella speaking to an unidentified person on his cell phone.[3] *Id.* at ¶¶ 64-65. At that point, Erickson again advised Kinsella that he was under arrest, placed both of Kinsella's arms behind his back, and handcuffed him. *Id.* at ¶¶ 66-70. According to Defendants, Erickson then placed a life jacket on Kinsella and lowered the sailboat's sail. *Id.* at ¶ 70. Petruska then used the motorboat to tow the sailboat back towards the area from where he and Erickson had launched the motorboat. *Id.* at ¶ 71. Erickson and Tracey were in radio communication for the duration of Kinsella's arrest and transport, and Erickson requested that Tracey and Ball meet him and Petruska at the shore. *Id.* at ¶¶ 73, 76-78. Once they arrived, Erickson and Petruska removed Kinsella from the sailboat, and turned him over to Tracey's and Ball's custody. *Id.* at ¶¶ 72, 74. According to Defendants, Erickson informed Tracey and Ball that Plaintiffs' sailboat had collided with Petruska's motorboat, secured Plaintiffs' sailboat by anchoring it near the shoreline, and returned to his post on the Pond. *Id.* at ¶¶ 75, 79-80.

---

[3] While Plaintiffs originally alleged that they publicly displayed a flag and a sign advocating for marriage equality while protesting on the Pond, and that Erickson observed both the flag and the sign, *see generally* Compl.; Pl. Opp, the undisputed evidence establishes that Erickson did not observe any flag or sign affixed to the sailboat, and it was only after he decided to arrest Plaintiffs for breaching the security perimeter and boarded the sailboat to perform those arrests, that he observed a sign advocating for marriage equality lying face down on the sailboat's deck. *See* Def. 56.1 ¶¶ 39, 55, 62, 64. For those reasons, this claim has no bearing on the Court's analysis.

Tracey and Ball walked Kinsella back to Tracey's marked police vehicle, at which point Kinsella requested that a police officer secure his camera, phone, and, according to Plaintiffs, medication. *Id.* at ¶ 81; *see also* Plaintiffs' *Pro Se* Response to Defendants' Rule 56.1 Statement ("Pl. 56.1"), DE [130-1], ¶ 81. Ball then conducted a search of Kinsella's person, drove Tracey and Kinsella back to the Department's headquarters, and processed Kinsella's arrest. Def. 56.1 ¶¶ 83-84. While Defendants contend that Kinsella did not: (i) appear to be in distress; (ii) require medical attention, or (iii) request his HIV medication, *see id.* at ¶ 85, Plaintiffs claim that Kinsella's requests for an officer to locate his medication or, alternatively, to acquire replacement medication from a pharmacy, were denied. *See* Pl. 56.1 ¶ 85. Erickson finished his detail on the Pond several hours after Kinsella's arrest, and returned to the Department's headquarters thereafter in order to assist with Plaintiffs' arrest processing. *Id.* at ¶¶ 87-88.

**E.** **Fink's Arrest and Transfer to the Police Station**

As Fink waded in the water towards the Perelman Estate, he began shouting and cursing at the fundraiser's attendees. *Id.* at ¶¶ 89-90, 95. Two uniformed security officers employed by the Perelman Estate – Jim Hart ("Hart") and Louis LaVolpe ("LaVolpe") – intercepted Fink and led him out of the water and onto a deck, where he was placed in handcuffs. *Id.* One of the fundraiser's attendees captured part of this interaction on his cell phone video camera. *Id.* at ¶¶ 91-94.

Hart and LaVolpe then turned Fink over to the custody of Theodore Pharaoh ("Pharaoh"), a police officer employed by the Department. *Id.* at ¶¶ 96-97. According

to Defendants, one of the individuals who initially apprehended Fink informed Pharaoh that Fink was under arrest for refusing to comply with Erickson's prior lawful order. *Id.* at ¶¶ 98, 105. Plaintiffs contend that Pharaoh "dragg[ed] Mr. Fink from the water onto the dock, forcibly roll[ed] him onto his stomach, pull[ed] [Fink's] arms behind his back…and handcuff[ed] him." Pl. 56.1 ¶ 100. Defendants counter that Pharaoh did not use any force on Fink "except to escort him into and out of [Pharaoh's] police vehicle," pursuant to the Department's official policies pertaining to the use of physical force, and procedures on arrest, handling, and confinement of prisoners. Def. 56.1 ¶¶ 100, 134. Pharaoh then transported Fink to the Department's headquarters, where he (Fink) "experienced heart trouble and was on the ground, apparently due to a medical issue." *Id.* at ¶ 101. Pharaoh immediately called an ambulance to attend to Fink. *Id.* at ¶ 102. When medical personnel arrived, they took Fink's blood pressure and talked to Fink in an attempt to calm him down. *Id.* They also requested that Fink come to the hospital with them, but Fink declined to because Kinsella, who was already in police custody, was not permitted to come with him. *Id.* at ¶¶ 102-3. The EMS Patient Care Report noted that Fink: (i) had "elevated blood pressure" but that "all other vitals [were] stable and within normal range"; and (ii) chiefly complained of "right shoulder discomfort," but noted that "inspection of the shoulder did not reveal bruising, swelling, or deformity; full range of motion, good distal pulse, and strength of grip." *Id.* at ¶ 104.

## F. **Plaintiffs' Criminal Charges and Subsequent Criminal Prosecution**

As the arresting officer, Erickson determined the Department's criminal charges against Plaintiffs. *Id.* at ¶ 106.  Erickson based the charges against Fink on his initial observation of Fink's actions, as well as information relayed to him by other officers present at the site of Fink's handcuffing, including Pharaoh. *Id.* at ¶ 107. The Department charged Plaintiffs with two misdemeanors each:  (i) obstructing governmental administration, in violation of New York Penal Law § 195.05; and (ii) resisting arrest, in violation of New York Penal Law § 205.30.  *Id.* at ¶¶ 108, 110. The East Hampton Town Police also charged Plaintiffs with one violation each – disorderly conduct, in violation of New York Penal Law § 240.20(4).  *Id.* at ¶¶ 109, 111.  Erickson set Plaintiffs' bail in the amount of $1,000 each – the maximum allowable bail for individuals charged with two misdemeanors.  *Id.* at ¶¶ 112-13. After being processed and paying bail, Plaintiffs were released from custody.  *Id.* at ¶ 114.  In total, Plaintiffs were held in custody for approximately three to four hours. *Id.* at ¶ 116.

Upon their release, Plaintiffs were each given appearance tickets, which instructed them to appear in the East Hampton Village Justice Court on August 8, 2012.  *Id.* at ¶ 115.  Upon their release from custody, Plaintiffs sought no medical attention for any alleged injuries sustained during the course of their arrests, and in fact posed for a photograph immediately following their release and attended a political fundraiser later that same day.  *Id.* at ¶¶ 117-19.  At no point after their

arrests did either Fink or Kinsella seek medical attention or psychological counseling for any alleged injuries sustained during the course of their arrest. *Id.* at ¶ 121.

Plaintiffs, both of whom received formal legal training, each entered initial pleas of "not guilty" to the criminal charges against them on August 8, 2012, and each accepted an adjournment in contemplation of dismissal ("ACD") on November 15, 2012. *Id.* at ¶¶ 122-23, 127-29, 133. On January 17, 2013, pursuant to their ACDs, all criminal charges against Plaintiffs were dismissed. *Id.* at ¶¶ 124-25, 130-31. Plaintiffs were each represented by legal counsel throughout their criminal proceedings. *Id.* at ¶¶ 126, 132.

G. **Procedural History**

Based on the above facts, Plaintiff commenced this action against Defendants by way of Complaint dated December 15, 2017, which asserted claims for: (i) false arrest, malicious prosecution, malicious abuse of process, excessive force, failure to intervene, and conspiracy in violation of the Fourth Amendment against all Defendants; (ii) denial of their rights to free speech and protest in violation of the First Amendment based on political speech against all Defendants; (iii) denial of their right to counsel in violation of the Fifth and Sixth Amendments against all Defendants; (iv) denial of equal protection and privileges and immunities under the law in violation of the Equal Protection Clause of the Fourteenth Amendment against all Defendants; (v) denial of medical treatment in violation of the Fourteenth Amendment against all Defendants; and (vi) various constitutional violations against all Defendants pursuant to *Monell v. Dept. of Soc. Serv. of City of New York,*

11

436 U.S. 658, 658-59, 98 S. Ct. 2018, 2019-20 (1978). *See* Complaint ("Compl."), DE [1], at 17-27. Defendants filed their Answer to the Complaint on September 3, 2015. *See* DE [14]. Discovery commenced following the parties' October 27, 2015 initial conference before this Court. *See* DE [20].

On October 5, 2021, Defendants moved for summary judgment, *see* Def. Mot., which Plaintiffs opposed. *See generally* Plaintiffs' Affidavit in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp." or "Plaintiffs' Opposition"), DE [130]. For the reasons set forth below, the Court respectfully recommends that Defendants' Motion be granted in its entirety and that the Complaint be dismissed with prejudice.

## II.    LEGAL STANDARDS

### A. <u>Fed. R. Civ. P. 56</u>

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). In deciding the motion, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party").

In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see also Artis v. Valls*, No. 9:10-cv-427, 2012 WL 4380921, at *6, n. 10 (N.D.N.Y. Sept. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment.").

## B. *Pro Se* Pleadings

It is well-established that pleadings filed by *pro se* plaintiffs are held "to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (internal quotation marks and citation

omitted).  Where an attorney is proceeding *pro se*, however, his pleadings are not entitled to the "special consideration which the courts customarily grant to *pro se* parties."  *Bazadier v. McAlary*, 464 Fed. App'x 11, 12 (2d Cir. 2012) (internal quotation marks and citation omitted).

Kinsella and Fink received formal legal training in Australia and the United States, respectively, and Fink is a former member of the New York bar.  *See* Def. 56.1 ¶¶ 127, 133.  Regardless of whether, under the circumstances, Plaintiffs are afforded a lower *pro se* pleading standard, their claims should be dismissed for the reasons set forth below.

## III.  DISCUSSION

Applying the standards set forth above, and for the reasons set forth below, the Court respectfully recommends that Defendants' Motion be granted in its entirety and that the Complaint be dismissed with prejudice.

42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured….

42 U.S.C. § 1983.  Although Section 1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).  To prevail on a claim arising under 42 U.S.C. § 1983, a plaintiff must demonstrate:  "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by

14

a person acting under the color of state[-]law." *Hawkins v. Nassau Cnty. Corr. Fac.*, 781 F. Supp. 2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983); *see also Dubin v. County of Nassau*, 277 F. Supp. 3d 366, 384 (E.D.N.Y. 2017) (quoting *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010)).

## A. **Plaintiffs' Fourth Amendment Claims**

At the heart of Plaintiffs' Complaint lie their Fourth Amendment Section 1983 claims, which are based on the argument that Defendants "violated Plaintiffs' freedom from unreasonable seizure of their persons" when Defendants "subject[ed] Plaintiffs to false arrest, false imprisonment, unreasonable conditions of confinement, unreasonable and excessive use of force, cruel summary punishment, verbal and physical abuse, loss of liberty and stigmatization" without probable cause, malicious prosecution, and malicious abuse of process. *See* Compl. ¶¶ 114-17. Defendants seek summary judgment on all of Plaintiffs' Fourth Amendment claims, arguing that: (i) Plaintiffs' claims are vitiated by the probable cause that existed to arrest them; and (ii) the situational "special law-enforcement needs" doctrine permitted law enforcement officers to apprehend both Plaintiffs on July 8, 2012. *See* Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Def. Mem."), DE [129-3], at 4, 8. The Court analyzes each of Plaintiffs' Fourth Amendment claims in turn.

### 1. <u>False Arrest</u>

Under federal law, a claim "for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the

right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "Accordingly, a plaintiff asserting such a claim must show some deprivation of liberty consistent with the concept of seizure." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 100, 116 (2d Cir. 1995)).  To sustain a claim, a plaintiff must establish that:  "(1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified." *Lee v. Town of Southampton*, No. 18-cv-3167, 2020 WL 1237198, at *12 (E.D.N.Y. Feb. 21, 2020), *report and recommendation adopted*, 2020 WL 1234200 (E.D.N.Y. Mar. 13, 2020) (quoting *Levantino v. Skala*, 56 F. Supp. 3d 191, 200 (E.D.N.Y. 2014)); *see also Harley v. City of New York*, No. 14-cv-5452, 2016 WL 552477, at *2 (E.D.N.Y. Feb. 10, 2016).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest…." *Palmer v. City of New York*, No. 19-cv-5542, 2021 WL 4480572, at *11 (E.D.N.Y. Sept. 30, 2021).  Probable cause exists when a law enforcement officer has "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *United States v. Diaz*, 854 F.3d 197, 203 (2d Cir. 2017). Moreover, a claim for false arrest turns only on whether probable cause existed to arrest a defendant on any charge, regardless of whether probable cause existed with

16

respect to each individual charge, "or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Owen v. City of Buffalo, New York*, 465 F. Supp. 3d 267, 275 (W.D.N.Y. 2020) ("[W]hen faced with a claim for false arrest, [courts] focus on the validity of the arrest, and not on the validity of each charge"); *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 593 (2004) (stating that an arresting officer's state of mind is irrelevant to the existence of probable cause, nor is the officer's subjective reason for the offense charged).

Applying these standards, the Court concludes that summary judgment in Defendants' favor is proper because probable cause existed with respect to each of the charges against Plaintiffs, thereby defeating their claim.

### a. *Obstruction of Governmental Administration*

Under New York law, probable cause exists to arrest an individual for obstruction of governmental administration ("OGA") when that individual "intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." N.Y. Pen. L. § 195.05. In this Circuit, it is well-settled that refusal to comply with lawful orders from law enforcement officers provides those officers with probable cause to arrest for OGA. *See Marcavage v. City of New York*, 689 F.3d 98, 101 (2d Cir. 2012) (upholding the constitutionality of OGA arrests of two protestors who rejected numerous directives from law enforcement officers to leave a no-demonstration zone on the sidewalk

outside of Madison Square Garden during the 2004 Republican National Convention, and insisted that they possessed an absolute right to protest on the public sidewalk); *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995); *Owen*, 465 F. Supp. 3d at 276; *Murray v. Ruderfer*, No. 15-cv-913, 2017 WL 1194371, at *5-6 (S.D.N.Y. Mar. 31, 2017); *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 545 (E.D.N.Y. 2015); *Johnson v. City of New York*, No. 05-cv-7519, 2008 WL 4450270, at *10 (S.D.N.Y. Sept. 29, 2008), *aff'd*, 689 F.3d 98 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1492 (Mar. 4, 2013).

Based on these standards, the Court concludes that probable cause existed to arrest both Plaintiffs for OGA on July 8, 2012.  Initially, the parties do not dispute that, on July 8, 2012, the Secret Service established a security zone around the Perelman Estate in order to protect Romney from dangerous threats, and Plaintiffs set sail on the Pond that day with the intention of protesting and disturbing the Romney fundraiser.  *See* Def. 56.1 ¶¶ 16-22, 37, 42-45, 89-94; Def. Add'l 56.1 ¶¶ 2-14, 16.  Plaintiffs further do not dispute that they sailed towards the Perelman Estate and, despite at least three directives from Erickson and explicit instructions from 911 dispatchers to turn around, they continued to sail towards the Perelman Estate pursuant to their alleged rights under the Dongan Patent.  *See* Def. 56.1 ¶ 32-33, 35-38, 40-44, 51-57; Def. Add'l 56.1 ¶¶ 18-23.  Defendants have also established that once police caught up to Plaintiffs' sailboat, which was then within approximately fifty feet of the Perelman Estate, Fink exited the sailboat, waded through the water,

and physically resisted Hart's and LaVolpe's efforts to apprehend him.  Def. 56.1 ¶¶ 53, 56-57, 89-100; Def. Add'l 56.1 ¶ 29.

Based on these facts, the Court concludes that Plaintiffs defied Erickson's and Petruska's lawful orders and interfered with the ability of law enforcement to keep the Secret Service-established security zone clear and Romney sufficiently protected. *See Marcavage*, 689 F.3d at 101 (permitting OGA arrests of two protestors who defied law enforcement directives to leave a no-demonstration zone and insisted that they possessed an absolute right to protest on the public sidewalk, when the "manifold risks" faced by law enforcement "ranged from pedestrian gridlock to assassination" of political officials); Def. 56.1 ¶¶ 32-33, 35-38, 40-44, 51-57; Def. Add'l 56.1 ¶¶ 18-23.[4] Accordingly, the Court concludes that probable cause existed to arrest Plaintiffs for OGA.

b. *Disorderly Conduct*

The Court next concludes that probable cause existed to arrest Plaintiffs for disorderly conduct.  Under New York law, a person is engaged in disorderly conduct when, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof" he disturbs any lawful assembly or meeting of persons without lawful authority.  N.Y. Pen. L. § 240.20(4).  Here, the undisputed evidence demonstrates that Plaintiffs intended to – and did – disturb the Romney fundraising event.  *See* Def. 56.1 ¶¶ 89-100; Def. Add'l 56.1 ¶¶ 27-28.  Further, in addition to

---

[4] Plaintiffs provide no – nor is the Court aware of any – legal authority suggesting that the Dongan Patent should be read to limit applicable First Amendment case law permitting reasonable time, place, and manner restrictions on free speech, or law enforcement's ability to reasonably enforce such restrictions, which is what occurred here.

19

Plaintiffs' act of breaching the security zone, Plaintiffs – while on the Pond outside the fundraising event – protested and shouted profanities at police and disturbed event attendees. *Id.* For these reasons, the Court concludes that probable cause existed to arrest Plaintiffs for disorderly conduct.

        c. *Resisting Arrest*

The Court similarly concludes that probable cause existed to arrest Plaintiffs for resisting arrest. An individual is guilty of resisting arrest under New York law when that person "intentionally prevents or attempts to prevent a police officer" from "effecting an authorized arrest of himself or another person." N.Y. Pen. L. § 205.30. Again, the evidence establishes that, after Plaintiffs' sailboat collided with the Marine Patrol motorboat, and Plaintiffs were advised that they were under arrest, they refused to comply with Erickson's orders to lower their sail and cooperate. *See* Def. 56.1 ¶¶ 33-55. Plaintiffs further concede that, contrary to Erickson's order, Fink jumped out of the sailboat and waded away from police, towards the Perelman Estate, in an effort to disrupt the Romney fundraiser, and physically resisted efforts to apprehend him. *See id.* at ¶¶ 89-100. Based on these facts, the Court concludes that probable cause existed to arrest Plaintiffs for resisting arrest. Accordingly, because Defendants have established that probable cause existed to arrest Plaintiffs for each of the three charges at issue, the Court respectfully recommends that Defendants be granted summary judgment as to Plaintiffs' false arrest cause of action.

d.  *"Special Needs" Exception*

In addition to their probable cause arguments, Defendants alternatively seek summary judgment as to Plaintiffs' false arrest cause of action based on the Fourth Amendment's "special needs" exception.  *See* Def. Mem. at 8-9.  The Supreme Court has recognized certain exceptions to the Fourth Amendment, under which warrantless seizures may be considered "reasonable."  *See Illinois v. McArthur*, 531 U.S. 326, 330, 121 S. Ct. 946, 949 (2001).  These exceptions include:  (1) special law enforcement needs; (2) an individual's diminished expectation of privacy; or (3) minimal or temporary seizures.  *Id.* at 330-31, 121 S. Ct. at 949-50.  The special needs exception applies where, as here, "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S. Ct. 733, 748 (1985) (Blackmun, J., concurring).  To trigger this exception, a search or seizure "must 'serve as its immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation.'"  *MacWade v. Kelly*, 460 F.3d 260, 268 (2d Cir. 2006) (quotations omitted)).

It is well-settled that law enforcement's protection of presidential candidates is covered by the "special needs" exception.  *See Berg v. Kelly*, 897 F.3d 99, 106-07 (2d Cir. 2018) (quoting *Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 1401 (1969)) ("[T]he 'Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats'"); *see also Wood v. Moss*, 572 U.S. 744, 763-64, 134

21

S. Ct. 2056, 2070 (2014) (actions of secret service agents were objectively reasonable in light of a valid security concern that the anti-Bush protesters were within "weapons range" of the President); *accord Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 537 (1991) (the principle of qualified immunity is "nowhere more important than when the specter of Presidential assassination is raised").

Under these standards, the Court concludes that Defendants have established that law enforcement's seizure of Plaintiffs was not only intended to protect Romney, a presidential candidate, but fell squarely within the ambit of the Fourth Amendment's "special needs" exception. *See McArthur*, 531 U.S. at 330, 121 S. Ct. at 949; Def. 56.1 ¶¶ 16-22; Def. Add'l 56.1 ¶¶ 2-14. Accordingly, the Court respectfully recommends that Defendants be granted summary judgment as to Plaintiffs' false arrest cause of action on this alternate basis.

2. <u>Malicious Prosecution</u>

Defendants next seek summary judgment as to Plaintiffs' malicious prosecution claim. To state a cause of action for malicious prosecution a plaintiff must allege: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff; (2) the termination of the proceeding in favor of the accused; (3) the absence of probable cause for the criminal proceeding; and (4) actual malice." *Anderson v. County. of Nassau*, 297 F. Supp. 2d 540, 546 (E.D.N.Y. 2004) (citing *Riccuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). Moreover, in this Circuit, it is well-settled that a plaintiff's "acceptance of an ACD bars [that plaintiff from bringing] a malicious-prosecution claim." *Palmer*, 2021 WL

4480572, at \*6 (quoting *Smalls v. Collins*, 10 F.4th 117, 143 (2d Cir. 2021)); *see also Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004); *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980).

In light of this case law, Plaintiffs' undisputed and voluntary acceptance of ACDs on November 15, 2012, as well as the January 17, 2013 dismissal of all criminal charges against each Defendant, *see* Def. 56.1 ¶¶ 122-33, their malicious prosecution cause of action cannot survive.  Accordingly, the Court respectfully recommends that Defendants' Motion be granted as to this claim.

3.  Malicious Abuse of Process

Defendants next seek summary judgment as to Plaintiffs' malicious abuse of process cause of action.  A plaintiff seeking to bring a malicious abuse of process claim must establish that the defendant:  "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of process."  *Savino v. City of New York*, 331 F.3d 63, 76-77 (2d Cir. 2003) (internal quotation marks omitted).  "[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution.  Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."  *Id.* at 77.  Moreover, "[t]he pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim."  *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 478 (E.D.N.Y. 2016) (citing *Lopez v. City of New York*, 901 F. Supp. 684,

23

691 (S.D.N.Y. 1995)).  "Examples of the types of collateral objectives covered by the tort of malicious abuse of process include the infliction of economic harm, extortion, blackmail, and retribution."  *Johnson v. City of New York*, No. 15-cv-8195, 2017 WL 2312924, at *18 (S.D.N.Y. May 26, 2017).

Here, both Plaintiffs' Complaint and Opposition are completely devoid of any allegations or substantive evidence regarding Defendants' collateral objective(s) in bringing criminal charges against them.  *See generally* Compl., Pl. Opp.  Accordingly, the Court concludes that Plaintiffs have failed to establish the elements of their malicious abuse of process cause of action, and respectfully recommends that Defendants' Motion be granted as to this claim.  *See Hardy v. City of New York*, No. 12-cv-17, 2013 WL 5231459, at *3 (S.D.N.Y. Jul. 9, 2013).

4. Excessive Force

The Court similarly concludes that Plaintiffs have failed to establish their excessive force cause of action.  The Supreme Court has held that where an excessive force claim "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."  *Graham v. Connor,* 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871 (1989). An excessive force claim is analyzed under the standard of reasonableness, balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396, 109 S. Ct. at 1871 (*quoting Tennessee v. Garner,* 471 U.S. 1, 2, 105 S. Ct. 1694, 1696 (1985)); *see also Curry v. City of Syracuse,* 316 F.3d 324, 332 (2d Cir. 2003)

24

("Application of physical force is 'excessive' when it is more than is necessary in the circumstances.").

Further, plaintiffs who are not injured or sustain *de minimis* injury in interactions with law enforcement are typically unsuccessful in bringing excessive force claims. *See Rolkiewicz v. City of New York*, 442 F. Supp. 3d 627, 638-39 (S.D.N.Y. 2020); *Lemmo v. McKoy*, No. 08–cv-4264, 2011 WL 843974,*5 (E.D.N.Y. 2011) (short-term pain, swelling, and bruising, brief numbness, minor discomfort, and superficial scratches and cuts are *de minimis* and defeat excessive force claim); *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (lack of "continuing injury" and lack of medical treatment is fatal to an excessive force claim).

Applying this case law, the Court concludes that Plaintiffs have not provided sufficient evidence to support their excessive force claim. Initially, the Court notes that Kinsella apparently no longer claims excessive force. *See* Def. Add'l 56.1 ¶¶ 36-38. Moreover, although Fink originally alleged that he was brutally assaulted by Defendants, he later admitted that this was not the case, *see* Def. 56.1 ¶¶ 89-100*,* nor do Plaintiffs explicitly oppose Defendants' Motion as to their excessive force claim. *See generally* Pl. Opp. Finally, the injuries suffered by Plaintiffs were *de minimis*, and therefore cannot support a cause of action. For all of these reasons, the Court respectfully recommends that Defendants be granted summary judgment as to Plaintiffs' excessive force claim.

5. <u>Failure to Intervene</u>

Defendants are likewise entitled to summary judgment as to Plaintiffs' failure to intervene claim.  As set forth above, the Fourth Amendment carries with it the right of law enforcement officials to use some degree of force when lawfully detaining an individual.  *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872.  However, the Fourth Amendment is violated if the amount of force used is "'objectively [un]reasonable' in light of the facts and circumstances confronting [the officers]." *Id.* at 397, 109 S. Ct. at 1872; *see also Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015); *Jackson v. Tellado*, 236 F. Supp. 3d 636, 661 (E.D.N.Y. 2017).  Similarly, liability may attach where an officer observes or has reason to know of the use of excessive force and fails to intervene in circumstances where the officer had a realistic opportunity to intercede and prevent the unlawful use of force from happening.  *See Jackson*, 236 F. Supp. 3d at 661; *Sanabria v. Tezlof*, No. 11-cv-6578, 2016 WL 4371750 *5 (S.D.N.Y. Aug. 12, 2016).  In order to sustain a claim for failure to intervene, a plaintiff must establish that a law enforcement officer:  (1) had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene.  *See Rolkiewicz*, 442 F. Supp. 3d at 646 (citing *Jackson v. City of New York*, 939 F. Supp. 2d 235, 258 (E.D.N.Y. 2013); *JeanLaurent v. Wilkinson*, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

Applying these standards, the Court concludes that Plaintiffs have provided insufficient evidence to create an issue of material fact and defeat Defendants' Motion

as to their failure to intervene claim. Plaintiffs' inability to establish an underlying constitutional violation with which law enforcement officers allegedly failed to intervene is fatal to their claim. *See Griffin v. Vill. of Southampton*, No. 04-cv-4052, 2019 WL 1572976, at *6 (E.D.N.Y. Apr. 11, 2019). Accordingly, Plaintiffs have failed to establish a failure to intervene, and the Court respectfully recommends that Defendants be granted summary judgment as to this cause of action.

6. Conspiracy

The Court next concludes that Plaintiffs' claim that Defendants conspired in determining which criminal charges to include in the charging instruments, fails as a matter of law. To prevail on their § 1983 conspiracy claim, Plaintiffs must establish: "(1) an agreement between two or more state actors[;] (2) concerted acts to inflict an unconstitutional injury[;] and (3) an overt act in furtherance of the goal." *See Carmody v. City of N.Y.*, No. 05-cv-8084, 2006 WL 1283125, at *5 (S.D.N.Y. May 11, 2006) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002)). Initially, Plaintiffs' failure to establish that they suffered an underlying violation of their constitutional rights renders their conspiracy claim defective. *See id.* Even assuming that Plaintiffs had established a deprivation of their rights, the record is devoid of any evidence of an agreement and/or concerted action on the part of Defendants to deprive Plaintiffs of any constitutional right. Further, Plaintiffs fail to allege specific facts to support their conspiracy claim – *i.e.*, the identities of the conspiring parties, the gravamen of the alleged agreement, or the overt act(s) in furtherance of the conspiracy. *See generally* Compl., Pl. Opp. These failures again

undercut their cause of action. *See Dwares v. City of New York*, 985 F.2d 94, 99-100 (2d Cir. 1993). Accordingly, the Court respectfully recommends that Defendants be granted summary judgment as to each of Plaintiffs' Fourth Amendment claims.

## B. Plaintiffs' First Amendment Claim

Defendants next seek summary judgment on Plaintiffs' First Amendment Section 1983 cause of action, which alleges that Plaintiffs' arrest prevented them from "engag[ing] in protected speech, association, and expressive conduct, which concerned political speech and matters of public concern." Compl. ¶ 113. Defendants counter that Plaintiffs' First Amendment claim fails because probable cause existed for their arrests. *See* Def. Mem. at 9.

In the Second Circuit, it is well-settled that an individual "does not have a First Amendment right to be free from a criminal prosecution supported by probable cause," even if that individual can establish that the prosecution was, in reality, "an unsuccessful attempt to deter or silence criticism of the government." *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012) (citing *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992)); *see also Caravalho v. City of New York*, 732 Fed. App'x 18, 23 (2d Cir. 2018); *Singer*, 63 F.3d at 120. Moreover, the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *see Heffron v. Intl. Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S. Ct. 2559, 2564 (1981), nor does it "guarantee access to property simply because it is owned or controlled by the government." *Cornelius v. NAACP Leg. Def. and Educ. Fund, Inc.*, 473 U.S. 788, 803, 105 S. Ct. 3439, 3449

(1985).  Indeed, reasonable time, place and manner restrictions on speech in limited public fora are constitutional, as long as they "are content-neutral, serve a significant government interest and leave open alternative channels for expression." *Gallagher v. Bd. of Educ. of E. Hampton Union Free Sch. Dist.*, No. 16-cv-473, 2017 WL 8813134, at *7 (E.D.N.Y. Dec. 21, 2017), *report and recommendation adopted as mod.*, 2018 WL 798882 (E.D.N.Y. Feb. 9, 2018) (quoting *Devine v. Vill. of Port Jefferson*, 849 F. Supp. 185, 190 (E.D.N.Y. 1994)).

Applying these standards, the Court concludes that Plaintiffs have failed to establish that Defendants prevented them from engaging in speech protected by the First Amendment, when Erickson attempted to prevent Plaintiffs from breaching the security perimeter, and arrested them for doing so, and respectfully recommends that Defendants' Motion be granted as to this claim.  Initially, the Court concludes that the security perimeter was a reasonable time, place and manner restriction because: (1) the perimeter was content neutral, restricting access to all persons, *see* Def. Add'l 56.1 ¶ 14; (2) the government had a substantial interest in ensuring the safety of Romney, a presidential candidate, *see Marcavage*, 689 F.3d at 104; and (3) the security perimeter appropriately served that goal by limiting access to only a portion of the Pond to only the few hours that Romney was present at the Perelman Estate. *See Caravalho*, 732 Fed. App'x at 23.

Additionally, although a single police boat was set up to prevent Plaintiffs from getting too close to Romney, Plaintiffs – or any other protestors – were able to communicate their ideas freely from behind the security perimeter, at the designated

29

demonstration area, or at any other public fora in the vicinity, meaning they had alternative channels for expressive communication.   *See* Def. Add'l 56.1 ¶ 5. Inasmuch as Plaintiffs may have wished to get closer to the Perelman Estate, "the First Amendment does not require the least restrictive or least intrusive means." *Marcavage*, 689 F.3d at 106 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S. Ct. 2746, 2757 (1989)) ("But a narrowly tailored restriction need not be the 'least restrictive or least intrusive means' of serving the government's interest…and the 'requirement that "ample alternative channels" exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs' by the restriction"); *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 101 (2d Cir. 2006).

Moreover, Plaintiffs' First Amendment claim fails as a matter of law because there was probable cause for their arrests.  *See Fabrikant*, 691 F.3d at 215 (quoting *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause…")); *Caravalho*, 732 Fed. App'x at 23; *Singer*, 63 F.3d at 120.  For these reasons, the Court concludes that Plaintiffs have failed to establish their First Amendment claim, and respectfully recommends that Defendants' Motion be granted as to this cause of action.

### C. <u>Plaintiffs' Fifth and Sixth Amendment Claims</u>

The Court next concludes that Defendants should be granted summary judgment as to Plaintiffs' Fifth and Sixth Amendment claims for denial of right to

counsel because Plaintiffs "have not named the United States government or any agency or employee thereof as a defendant in this matter." *MacPherson*, 2013 WL 6058202, at *16 (quoting *Cassidy v. Scoppetta,* 365 F. Supp. 2d 283, 286 (E.D.N.Y. 2005). "The Fifth Amendment governs the conduct of the federal government and federal employees, and does not regulate the activities of state officials or state actors." *MacPherson*, 2013 WL 6058202, at *16 (citing *Guadagni v. New York City Transit Auth.,* No. 08-cv-3163, 2009 WL 1910953, at *7 (E.D.N.Y. June 30, 2009) ("The right to due process guaranteed by the Fifth Amendment, however, applies only with regard to the federal government…."); *Dawkins v. City of Utica,* No. 93-cv-373, 1997 WL 176328, at *4 (N.D.N.Y. Apr. 4, 1997)). Likewise, the Sixth Amendment guarantees all criminal defendants the right to counsel at the initiation of formal criminal proceedings – typically the filing of a criminal complaint or other accusatory instrument. *See Brewer v. Williams*, 430 U.S. 387, 398, 97 S. Ct. 1232, 1239 (1977); *Miller v. O'Bryan*, 498 F. Supp. 2d 548, 557 (N.D.N.Y. 2007); *Nesbitt v. County of Nassau*, No. 05-cv-5513, 2006 WL 3511377, at *2 (E.D.N.Y. Dec. 6, 2006).

In light of this case law, the Court concludes that Plaintiffs have failed to provide sufficient evidence to defeat Defendants' Motion as to their Fifth and Sixth Amendment causes of action. Initially, Plaintiffs have failed to allege any action on the part of federal officials, *see generally* Compl., rendering their Fifth Amendment claim fatally defective. *See MacPherson*, 2013 WL 6058202, at *16. Plaintiffs' Sixth Amendment claim similarly fails because they were both represented by retained counsel from August 8, 2012, when each Plaintiff entered an initial plea of "not guilty"

to the criminal charges against them, to November 15, 2012, when Kinsella and Fink each accepted an ACD.  *See* Def. 56.1 ¶¶ 122-33.  For these reasons, the Court concludes that Plaintiffs have failed to establish the necessary elements of their Fifth and Sixth Amendment claims for denial of right to counsel.  Accordingly, the Court respectfully recommends that Defendants be granted summary judgment as to these claims.

### D. <u>Plaintiffs' Fourteenth Amendment Claims</u>

#### 1. <u>Equal Protection Clause</u>

Plaintiffs' equal protection cause of action also fails as a matter of law.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S. Ct. 2382, 2394 (1982)); *see also Moskowitz v. Great Neck Union Free Sch. Dist.*, No. 20-cv-1659, 2021 WL 4268138, at *16 (E.D.N.Y. Aug. 4, 2021), *report and recommendation adopted*, 2021 WL 3878777 (E.D.N.Y. Aug. 31, 2021).  A plaintiff asserting a class-based equal protection claim under Section 1983 must allege that the discriminatory actions were intentional and based on membership in a protected class.  *See Kramer v. Dane*, No. 17-cv-5253, 2018 WL 5077164, at *8 (E.D.N.Y. July 26, 2018), *report and recommendation adopted*, 2018 WL 4489284 (E.D.N.Y. Sept. 19, 2018) (citing *Brown v. City of Oneonta*, 221 F.3d 329, 337-39 (2d Cir. 2000)).  In order to establish

discriminatory conduct, a plaintiff must submit evidence that he or she was treated differently than similarly situated non-class members. *See Mamot v. Geico Car Ins.*, No. 21-cv-6717, 2021 WL 4443124, at *3 (S.D.N.Y. Sept. 27, 2021), *reconsideration denied sub nom. Mamot v. Geico Car Ins., et al*, 2021 WL 5567389 (S.D.N.Y. Nov. 29, 2021) ("The Equal Protection Clause of the Fourteenth Amendment essentially prohibits the disparate treatment of similarly situated individuals.").

Alternatively, a plaintiff may pursue an equal protection claim under a "class of one" theory. *See Kramer*, 2018 WL 5077164, at *8 (citing *Vassallo v. Lando*, 591 F. Supp. 2d 172, 183 (E.D.N.Y. 2008)). A class-of-one equal protection claim arises when an individual is "intentionally treated differently from others similarly situated" and "there is no rational basis for the difference in treatment." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074 (2000)).

Under these standards, the Court concludes that Plaintiffs' equal protection claim fails under both the class-based and "class of one" theories. While Plaintiffs plead membership in a protected class "based on their sexual orientation," Compl. ¶¶ 120, 135, their failure to identify any comparators – individuals similarly situated to Plaintiffs with whom the Court can compare their treatment by Defendants – is fatal to their equal protection claim under both theories. *See Fortress Bible Church*, 694 F.3d at 222 ("[A] class-of-one claim requires a plaintiff to show an extremely high degree of similarity between [himself] and [his] comparators.") (internal citations omitted); *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 58-60 (2d Cir.

2010); *Avent v. Keybank*, No. 21-cv-01466, 2021 WL 1253840, at *3 (S.D.N.Y. Apr. 1, 2021) (To state a class-based equal protection claim, "a plaintiff must allege that he is a member of a suspect or quasi-suspect class of persons," including "classes identified by race, gender, alienage, or national origin," and that " the defendants have purposefully discriminated against him because of his membership in that class.") (internal quotations and citations omitted); *Mazzone v. Town of Southampton*, 283 F. Supp. 3d 38, 50-52 (E.D.N.Y. 2017), report *and recommendation adopted as mod.*, 2017 WL 6017357 (E.D.N.Y. Dec. 1, 2017); *McCluskey v. Town of Southampton*, No. 12-cv-2394, 2013 WL 4049525, at *7-8 (E.D.N.Y. Aug. 9, 2013).

Plaintiffs have submitted no evidence that any other person attempted to protest at the Pond that day, or that any protestors attempted to breach the security perimeter, or were successful in doing so. *See* Def. Add'l 56.1 ¶ 30. For these reasons, the Court concludes that Plaintiffs' equal protection cause of action fails as a matter of law, and respectfully recommends that Defendants' Motion be granted as to Plaintiffs' equal protection claim.

### 2. Denial of Medical Attention

Plaintiffs' cause of action for denial of medical attention is also untenable. Plaintiffs' claim for denial of medical attention to a pretrial detainee held in state custody is properly brought under the Fourteenth Amendment. *See Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir. 2009). To establish a constitutional claim arising out of inadequate medical care, a plaintiff must prove that prison or jail officials were

34

deliberately indifferent to his "serious medical needs." *Gomez v. County of Westchester*, 649 Fed. App'x 93, 95 (2d Cir. 2016).

Pursuant to this case law, the Court concludes that Plaintiffs have failed to establish their denial of medical attention claim sufficient to defeat Defendants' Motion. Initially, the Court notes that Kinsella is no longer making a claim for denial of medical attention. *See* Def. Add'l 56.1 ¶ 32. Similarly, while Fink claims that he sustained minor scrapes and cuts during the arrest, these injuries do not satisfy the "serious medical needs" standard. *Rolkiewicz*, 442 F. Supp. 3d at 646-47 (bruise to the head did not amount to "condition of urgency"); *Ford v. Phillips*, No. 05-cv-6646, 2007 WL 946703, at *12 (S.D.N.Y. Mar. 27, 2007). Additionally, Plaintiffs do not dispute that Fink requested and received treatment from emergency medical personnel, who observed that he was not injured and only his blood pressure was elevated, for which Fink refused further treatment. *See* Def. 56.1 ¶¶ 101-104. For these reasons, the Court respectfully recommends that Defendants be granted summary judgment as to Plaintiffs' Fourteenth Amendment claims.

### E. Claims Against the Individual Defendants Fail as a Matter of Law

Moreover, Plaintiffs' claims against the Individual Defendants fail against them in their official and individual capacities. In the Section 1983 context, where a plaintiff names both a municipal entity and an official employed by that entity in that person's official capacity, district courts have "consistently dismissed the official capacity claims as redundant." *Gazzola v. County of Nassau*, No. 16-cv-0909, 2016 WL 6068138, at *4 (E.D.N.Y. Oct. 13, 2016) (citations omitted); *see also Medrano v.*

*Margiotta*, No. 15-cv-3097, 2017 WL 886986, at *5 (E.D.N.Y. February 16, 2017) ("To the extent Plaintiffs assert claims against the individual defendants in their official capacities, these claims must fail because they are duplicative of the claims asserted by Plaintiffs against [the Town]."). Accordingly, because Plaintiffs' claims are asserted against the Village, summary judgment is appropriate as to Plaintiffs' official capacity claims.

As to the Individual Defendants' individual liability, the Court concludes that neither the Complaint nor evidentiary record shows that any of the Individual Defendants were personally involved in any violation of Plaintiffs' constitutional rights. *See Gazzola*, 2016 WL 6068138, at *5; *Rivera v. Metro. Transit Auth.,* 750 F. Supp. 2d 456, 462 (S.D.N.Y. 2010) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to a damages award under Section 1983."). Without any evidence that any of the Individual Defendants directly participated in any alleged constitutional violations, Plaintiffs' First, Fourth, Fifth, Sixth, and Fourteenth Amendment claims fail as a matter of law as to them individually, and respectfully recommends that the Complaint be dismissed with prejudice.

Moreover, the Individual Defendants are shielded from liability under the doctrine of qualified immunity. Qualified immunity protects federal and state officials from both civil damages and "unnecessary and burdensome discovery or trial proceedings[,]" *Spavone v. New York State Dep't of Corr. Serv.*, 719 F.3d 127, 134 (2013) (quoting *Crawford–El v. Britton,* 523 U.S. 574, 598, 118 S. Ct. 1584, 1596

36

(1998)), "where the officials' conduct was not in violation of a 'clearly established' constitutional right." *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir. 2012), *cert. denied,* 569 U.S. 1018, 133 S. Ct. 2777 (2013); *see also Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013) ("A federal official is entitled to qualified immunity from suit for money damages unless the plaintiff shows that the official violated a statutory or constitutional right, and that the right was 'clearly established' at the time of the challenged conduct.").   Qualified immunity extends to circumstances where an official's conduct" does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," and applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Spavone,* 719 F.3d at 135 (quoting *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009)).   "So long as a defendant has an objectively reasonable belief that his actions are lawful, he is entitled to qualified immunity." *Spavone,* 719 F.3d at 135 (internal quotations and citation omitted).

Qualified immunity applies here because – as reflected in the above analysis – the record lacks any evidence that the Individual Defendants violated Plaintiffs' constitutional rights.   Accordingly, the Court respectfully recommends that Defendants' motion for summary judgment on this alternate basis be granted as to the Individual Defendants, and that the Complaint again be dismissed as to them with prejudice.

37

### F.  **Plaintiffs' *Monell* Liability Claim**[5]

Defendants next seek summary judgment as to Plaintiffs' claim for liability

pursuant to *Monell*, 436 U.S. at 658-59, 98 S. Ct. at 2019-20.  *See* Def. Mem. at 23-25.

Based on the Complaint and Plaintiffs' Opposition, Plaintiffs' *Monell* claim appears

to be premised on the theory that all Defendants have a policy of:  (1) making false

arrests based on false charges; and (2) inadequate "training, supervision, and/or

discipline of its officers" on matters dealing with "politically protected speech."  *See*

Compl. ¶¶ 143-45.

Under *Monell*, municipalities and other local governmental entities may be

held liable under 42 U.S.C. § 1983 for constitutional violations caused by an official

policy or custom.  *See* 436 U.S. at 658-59, 98 S. Ct. at 2019-20.  Although Plaintiffs'

*Monell* cause of action is alleged against all Defendants, *Monell* applies only to

municipal entities.  *See id.* at 691, 98 S. Ct. 2018 at 2036; *see also Patterson v. County*

*of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004).  The "policy or custom" element may be

established by demonstrating:  (1) a formal policy officially endorsed by the

municipality; (2) actions taken by government officials responsible for establishing

the municipal policies that caused the particular deprivation in question; (3) a

practice so consistent and widespread that, although not expressly authorized,

constitutes a custom or usage of which a supervising policy-maker must have been

aware; or (4) a failure by policymakers to provide adequate training or supervision to

---

[5] As Plaintiffs allege *Monell* liability as a separate cause of action, *see* Compl. ¶¶ 138-55, and not as part of any of their other claims, the Court addresses Defendants' alleged *Monell* liability apart from its § 1983 analysis.

subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *See Kucharczyk v. Westchester Cnty.*, 95 F. Supp. 3d 529, 538-39 (S.D.N.Y. 2015) (citing *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)); *see also Jones v. Westchester Cnty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 419 (S.D.N.Y. 2008).

In accordance with the above standards, the Court respectfully recommends that Defendants' Motion be granted as to Plaintiffs' *Monell* claim because Plaintiffs have failed to provide evidence to support a claim of any unlawful policy, practice or custom.

### 1. Failure to Prove Existence of a Formal Policy

Plaintiffs allege that they were victimized by the Village's policy of permitting the Department and its employees to "knowingly and willingly file false reports, false criminal complaints, false criminal allegations, and false charges against innocent individuals such as Plaintiffs – with immunity." Compl. ¶ 143. The undisputed evidence before the Court, however, fails to support such a claim.

Initially, the Court notes that there is no evidence in the record to suggest that such a policy existed. Further, there is no evidence that the Village permitted the Department or its employees to concoct false criminal charges against civilians with impunity, and Plaintiffs fail to identify any other civilians who were subjected to similar mistreatment. *See Brandon*, 705 F. Supp. 2d at 268-69. Accordingly, Plaintiffs have failed to establish the existence of a municipal policy.

39

2.  <u>Failure to Show that Policymaker Caused Plaintiffs' Alleged Injuries</u>

While Plaintiffs next appear to claim that Rickenbach, Larsen, and Tracey, as final policymakers, "acted under color of custom and policy to condone, encourage and promote the deprivation of Plaintiffs' Fourth, Fifth, Sixth and Fourteenth Amendment rights[,]" Compl. ¶ 153, the Court again concludes that summary judgment in Defendants' favor is appropriate because the record is completely devoid of any evidence to support this allegation. *See Rosu v. City of New York*, No. 11-cv-5437, 2012 WL 6582534, at *5 (S.D.N.Y. Dec. 13, 2012) ("In order for an individual to be subject to Section 1983 liability in his or her official capacity, that individual must have had personal involvement in [the] alleged constitutional deprivations [as] a prerequisite to an award of damages.'") (internal quotations omitted).

Indeed, Plaintiffs have put forth no evidence that either Rickenbach, Larsen, or Tracey can be considered a policymaker under *Monell*, possesses final policymaking authority, or "had any direct involvement with, knowledge, or responsibility for the alleged deprivation" of Plaintiffs' civil rights. *Jeffers v. City of New York*, No. 15-cv-2965, 2015 WL 3915306, at *2 (E.D.N.Y. Jun. 25, 2015). Accordingly, the Court concludes that Plaintiffs have failed to establish a *Monell* violation based on the acts of an individual with policymaking authority. *See Wingate v. City of New York*, No. 14-cv-4063, 2018 WL 3863439, at *10 (E.D.N.Y. Aug. 14, 2018).

3. <u>Failure to Prove Existence of a Widespread Practice</u>

Plaintiffs next fail to establish that existence of the Village's allegedly widespread practice of permitting the Department and its employees to "knowingly and willingly file false reports, false criminal complaints, false criminal allegations, and false charges against innocent individuals…." Compl. ¶ 143.

In order to establish *Monell* liability based upon a "persistent and widespread" practice by a subordinate municipal employee or employees, a plaintiff must show "sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse." *Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012); *see also Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) (acknowledging that inaction may lead to municipal liability for the "persistent failure to discipline subordinates who violate civil rights" as it can "give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*"). It is only at that point that, although not expressly authorized, the unconstitutional conduct is so persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware. *See Lucente v. County of Suffolk*, 980 F.3d 284, 297-98 (2d Cir. 2020) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04, 117 S. Ct. 1382, 1388 (1997)).

Applying these standards, not only have Plaintiffs failed to prove that any unconstitutional practice existed, but also that such a practice was so widespread as to put the Village on notice regarding its existence. Further, it is undisputed that

41

Plaintiffs have failed to identify any other individuals who were aware of, or even affected, by this alleged practice. *See Deferio v. City of Syracuse*, 770 Fed. App'x 587, 591 (2d Cir. 2019); *Slater v. County of Orange*, 345 F. Supp. 3d 378, 393-94 (S.D.N.Y. 2018).

### 4. Failure to Show a Failure to Properly Train or Supervise

"A plaintiff may demonstrate the existence of a policy or custom where the municipality, demonstrating conscious and deliberate indifference, fails to adequately train its employees…. However, this requires more than 'the mere assertion that a municipality has…a custom or policy.'" *Smith v. Doe*, No. 15-cv-0245, 2016 WL 7046803, at *3 (E.D.N.Y. Oct. 31, 2016) (citations omitted); *Dawson v. Westchester Cnty.*, No. 18-cv-7790, 2019 WL 3408899, at *4 (S.D.N.Y. July 29, 2019).

To establish a *Monell* claim based on a failure to train, a plaintiff must show: (1) that "a policymaker [of the municipality] knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). A municipality is deliberately indifferent where it fails to act when it has "actual or constructive notice," generally from "[a] pattern of similar constitutional violations by untrained employees," that its training program is "deficient." *Hernandez v. United States*, 939 F.3d 191, 207 (2d Cir. 2019). A plaintiff,

therefore, "must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Id.* As the Supreme Court explained in *Connick v. Thompson*, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of a failure to train." 563 U.S. 51, 62, 131 S. Ct. 1350, 1360 (2011).

Here, Plaintiffs' allegation that Defendants "intentionally fail[ed] to adhere to, or implement" and displayed a deliberate indifference to the training to ensure that the Department or its officers did not violate the constitutional rights of individual citizens, and that such a failure caused Plaintiffs' alleged injuries, *see* Compl. ¶ 145, is wholly unsupported by the evidentiary record and, without more regarding any training deficiency, is insufficient to establish a viable *Monell* claim. *See Vail v. City of New York*, 68 F. Supp. 3d 412, 431 (S.D.N.Y. 2014) ("[B]ecause Plaintiff provides no additional detail beyond the general assertion that the City failed to train its employees, his allegation is insufficient to state a claim.").

The record also lacks any evidence that Rickenbach's, Larsen's, or Tracey's alleged conduct "is part of a recurring pattern, or has previously been the subject of complaints." *Brewster v. Nassau Cnty.*, 349 F. Supp. 2d 540, 549 (E.D.N.Y. 2004); *Moran v. County of Suffolk*, No. 11-cv-3704, 2015 WL 1321685, at *10 (E.D.N.Y. Mar. 24, 2015) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."). Indeed, there is no evidence that the Village knew of a single incident – let alone a pattern – of any Department employee arresting individuals based on

43

fabricated charges, with the goal of violating those individuals' constitutional rights. *See Lawrence v. City of Rochester*, No. 09-cv-6078, 2015 WL 510048, at *7 (W.D.N.Y. Feb. 6, 2015) ("Deliberate indifference may be inferred from the failure to train or supervise based on proof of repeated complaints of civil rights violations that 'are followed by no meaningful attempt on the part of the municipality to investigate or to forestall.'").

Based on the above, the Court concludes that, because Plaintiffs have failed to establish that Rickenbach's, Larsen's, or Tracey's alleged conduct is part of a recurring pattern, or has previously been the subject of complaints, they have failed to make out a *prima facie* case based on a failure to train or supervise.  Accordingly, Plaintiffs have failed to offer sufficient evidence to establish *Monell* liability, and the Court respectfully recommends that Defendants be granted summary judgment on this claim.

## IV.   CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Defendants' Motion be granted in its entirety, and that the Complaint be dismissed with prejudice.

## V.   OBJECTIONS

A copy of this Report and Recommendation is being served on Defendants by electronic filing on the date below.  Defendants are directed to promptly serve a copy of this Report and Recommendation on Plaintiffs and file proof of service.  Any objections to this Report and Recommendation must be filed with the Clerk of the

Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


Dated:      Central Islip, New York
            December 6, 2021

                                        /s/ Steven I. Locke
                                        STEVEN I. LOCKE
                                        United States Magistrate Judge